Robert V. BERGWALL, As Personal Representative of the Estate of Lucille M. Bergwall and on behalf of himself Individually, et al.   Plaintiffs,

v.

MGH HEALTH SERVICES, INC., d/b/a MONTGOMERY GENERAL HOSPITAL Defendant.

No. CIV. PJM 00–2184.

United States District Court, D. Maryland.

Dec. 20, 2002.

Diane V. D'Aiutolo, Tydings and Rosenberg LLP, Baltimore, MD, for Plaintiffs.

James P. Gleason, Jr., Gleason Flynn Emig and Fogleman, Rockville, MD, for Defendant.

## OPINION

MESSITTE, District Judge.

Robert V. Bergwall, as Personal Representative of the Estate of Lucille M. Bergwall and for himself individually, joined by other survivors of Mrs. Bergwall, has sued MGH Health Services, Inc., d/b/a Montgomery General Hospital (MGH), pursuant to the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (EMTALA or the Act). MGH has filed a Renewed Motion for Summary Judgment.[1] Plaintiffs have filed an opposition. The Court will GRANT the Motion.

---

1. The Court denied without prejudice MGH's first Motion for Summary Judgment for Lack of Subject Matter Jurisdiction to permit discovery so that the parties might determine precisely what events took place during Mrs. Bergwall's hospitalization.

## I.

The action arises out of the care and treatment MGH provided to Mrs. Bergwall before her transfer from its emergency facility in Olney, Maryland. The following facts are undisputed.

At approximately 12:30 a.m. on April 9, 1999, Mrs. Bergwall, age 71, arrived by ambulance at MGH's emergency department after complaining of dizziness and chest pains. Upon her arrival, she was seen by a triage nurse who conducted an initial work-up and took Mrs. Bergwall's vital signs, medical history, physical complaints and other preliminary information. Approximately thirty-five minutes later, at 1:05 a.m., Dr. Ellen Smith, an emergency room physician, examined Mrs. Bergwall and found her in "no acute distress," with a normal heart rate and rhythm and normal respiration. Nevertheless, Dr. Smith ordered several serum cardiac marker or enzyme tests (including CK, CKMB and Troponin), a chest x-ray, and an electrocardiogram (EKG). These tests were administered and the results given to Dr. Smith who, at 2:45 a.m., re-examined Mrs. Bergwall. At that point, Mrs. Bergwall indicated she was feeling better. Upon reviewing the results, however, Dr. Smith diagnosed Mrs. Bergwall as having experienced "bradycardia",[2] "near syncope vasovagal"[3] and an "acute [myocardial infarction] (or within the past week inferior-posterior)."[4] She thereupon telephoned Kaiser Foundation Health Plan of the Mid–Atlantic States, Inc. (Kaiser Permanente), Mrs. Bergwall's health maintenance organization (HMO), asking for and receiving authorization for a cardiology consultation.

At around 4:30 a.m., the consultant, Dr. Daniel Goldberg, a cardiologist at MGH, arrived and conducted his own examination of Mrs. Bergwall. Dr. Goldberg found her to be "in no acute distress with a blood pressure of 116/72, pulse rate [of] 72 and regular" and "presently free from chest discomfort," with normalized blood pressure after intravenous hydration. Even so, he also found that she appeared to be suffering from "acute coronary syndrome—probable acute [myocardial infarction]" in the inferior-posterior wall and recurrent chest pain. He therefore devised a treatment plan, specifically seeking to admit Mrs. Bergwall to MGH's Critical Care Unit (CCU) for further observation,[5] where he could conduct further cardiac tests (including an echocardiogram and a right-sided EKG) and administer a contingent cardiac catheterization, if necessary. Kaiser Permanente, however, directed that one of its independent contractor physicians should take over as Mrs. Bergwall's attending physician. Accordingly, at around 8:30 a.m., Dr. Anurita Mendhiratta, an internist designated by the HMO, saw

---

**2.** "Bradycardia" is the "slowness of the heartbeat, usually defined (by convention) as a rate under 50 beats/min." STEADMAN'S MEDICAL DICTIONARY 232 (27th ed.2000).

**3.** "Syncope vaso-vagal" appears to be a "faintness or loss of consciousness due to reflex reduction in blood pressure." STEADMAN'S MEDICAL DICTIONARY 1745 (27th ed.2000).

**4.** A "myocardial infarction" is the "sudden insufficiency of arterial or venous blood supply ... to a segment of the heart muscle, usually as a result of occlusion of a coronary artery;" *i.e.*, a heart attack. STEADMAN'S MEDI-CAL DICTIONARY 894–95 (27th ed.2000). A "posterior myocardial infarction involves the posterior wall [or lower portion] of the heart." *Id.* at 895. Steadman's Medical Dictionary notes that description of posterior myocardial infarction at one time was erroneously used to describe an infarction "involving the inferior or or diaphragmatic surface of the heart." *Id.*

**5.** On deposition, Dr. Goldberg stated that by "CCU" he meant the hospital's "combined critical care unit" for surgical patients, medical patients and cardiac patients.

Mrs. Bergwall. As did Dr. Goldberg, Dr. Mendhiratta diagnosed Mrs. Bergwall as having an acute coronary syndrome but, instead of ordering her to be admitted to the CCU, ordered her into a less intensive unit, the Intermediate Care Unit (ICU or IMC). At the time, however, the ICU was unable to assign Mrs. Bergwall a bed due to limited availability and, as a result, she remained a "boarder" in MGH's emergency center waiting for a bed to open.

At around 11:30 a.m., while still a "boarder," Mrs. Bergwall began to complain of slight chest pains—a level three on a scale of one to ten. Shortly afterwards, both Drs. Goldberg and Mendhiratta re-examined her. Throughout the examination, Mrs. Bergwall's vital signs were monitored. As Dr. Mendhiratta reviewed and compared her vital signs, she noted that her patient appeared to be more stable than when she first examined her. Despite the improvement, however, both physicians decided that Mrs. Bergwall should be transferred to another hospital facility where she could receive a cardiac catheterization and perhaps other appropriate cardiac procedures. Because MGH apparently lacked the capability to perform a cardiac catheterization or bypass surgery under the circumstances, another facility, it was determined, would be better equipped to handle the patient's condition in case any complications might arise. Upon being notified of the decision to transfer her, Mrs. Bergwall and her family requested that she be moved to the Washington Hospital Center (WHC) under the care of Bruce Zinsmeister, M.D.

Preparations were then made to comply with this request. At noon, Dr. Mendhiratta called Dr. Zinsmeister's office to find out whether he would accept the transfer but was not, at first, able to reach him. At 1:14 p.m., Dr. Mendhiratta called Kaiser Permanente to notify it that she was trying to contact Dr. Zinsmeister, indicating that she would also inform Mrs. Bergwall's outside primary care provider, Dr. Merendino, of Mrs. Bergwall's status. Later that afternoon, Dr. Mendhiratta learned that Dr. Zinsmeister had agreed to accept the transfer;[6] and at 3:00 p.m., she contacted Kaiser Permanente to advise it that Dr. Zinsmeister wanted Mrs. Bergwall admitted directly to WHC for a cardiac catheterization to take place the next day. Kaiser Permanente thereupon arranged for placement of Mrs. Bergwall at WHC and an ambulance to transfer her there. The scheduled time for the transfer was 5:00 p.m. As of 4:20 p.m., however, WHC had no bed available and, because the ambulance would not agree to transfer Mrs. Bergwall without a bed number, Kaiser put the ambulance on hold. Meanwhile, Mrs. Bergwall remained a "boarder" in MGH's emergency center where the nursing staff frequently monitored her vital signs.

At around 5:00 p.m., Dr. Mendhiratta called MGH's emergency center to check on Mrs. Bergwall's status and learned that she had not yet been transferred. Also, at or around that time, Dr. Mendhiratta completed an Emergency Transfer Form, obtaining Mrs. Bergwall's written consent to the transfer.[7] When filling out the report, Dr. Mendhiratta again assessed Mrs. Bergwall's condition, taking her vital signs. The doctor noted that her patient was "awake, alert and oriented." At 6:50 p.m., WHC advised Kaiser Permanente that it was still attempting to arrange a bed and

---

6. Dr. Merendino also approved the transfer.

7. The time on the report indicates that it was executed at 7:55 p.m. However, in her deposition, taken approximately nineteen months later, Dr. Mendhiratta testified that she does not believe she saw Mrs. Bergwall after 5:00 p.m. that afternoon. MGH does not dispute Dr. Mendhiratta's deposition testimony.

that it would inform the HMO when one became available. Throughout this time, Mrs. Bergwall remained as a emergency room "boarder" at MGH.

By 9:30 p.m., WHC had secured a bed for Mrs. Bergwall and an ambulance arrived at MGH to transport her there. Unfortunately, shortly after arriving at WHC, Mrs. Bergwall collapsed and died. The time and date of death was 12:15 a.m., April 10, 1999.

## II.

Thereafter Mrs. Bergwall's surviving husband and children brought suit against MGH in this Court. As originally filed, their Complaint consisted of two counts under EMTALA, one for inadequate medical screening per 42 U.S.C. § 1395dd(a) (Count I), and a second for failure to stabilize Mrs. Bergwall before transferring her per 42 U.S.C. §§ 1395dd(b) & (c) (Count II), a third count for negligence framed as a state survival action (Count III) and a fourth count for negligence framed as a state wrongful death action (Count IV). MGH subsequently impleaded several third-party defendants on the two state negligence counts, including Kaiser Permanente, Dr. Mendhiratta and Dr. Goldberg, but on motion of the parties, the Court trimmed the case considerably. By Order dated August 29, 2002, it dismissed the third-party claims without prejudice, declining as a matter of discretion to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c). In the same Order, construing MGH's Motion to Transfer the Negligence Claim to State Court as a Motion to Dismiss, the Court granted that Motion without prejudice. Accordingly, only the two EMTALA claims remained. Those claims constitute the subject of MGH's Renewed Motion for Summary Judgment.

## III.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that they moving party is also entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he burden on the moving party may be discharged by a 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Motor Club of America Ins. Co. v. Hanifi,* 145 F.3d 170, 174 (4th Cir.) (quoting *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505), *cert. denied,* 525 U.S. 1001, 119 S.Ct. 509, 142 L.Ed.2d 423 (1998).

Once the moving party has met this burden, the burden of production shifts to the nonmoving party who "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading," FED. R. CIV. P. 56(e), but must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Shaw v. Stroud,* 13 F.3d 791, 798 (4th Cir.1994). In making this determination, the evidence of the party opposing summary judgment is to be believed and all

justifiable inferences drawn in his favor. *See Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 196 (4th Cir.1997) (citing *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505). A "mere existence of a scintilla of evidence in support of ... plaintiff's position," however, is not enough to defeat summary judgment. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

## IV.

■■■ In 1986, Congress enacted EMTALA " 'to address a growing concern with preventing 'patient dumping,' the practice of refusing to provide emergency medical treatment to patients unable to pay, or transferring them before emergency conditions were stabilized.' " *Vickers v. Nash Gen. Hosp.*, 78 F.3d 139, 142 (4th Cir.1996) (quoting *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851, 856 (4th Cir. 1994)). Its purpose, in principal part, was to require participating hospitals with emergency facilities "to provide emergency care to all individuals who come there" by "determin[ing] whether or not an emergency condition exists" and then stabilizing that condition. *Id.* at 142 (quoting *Brooks v. Maryland Gen. Hosp., Inc.*, 996 F.2d 708, 715 (4th Cir.1993) and quoting § 1395dd(a)). EMTALA's proscriptions thus focus on a hospital's disparate treatment of—or its total failure to treat—an individual in need of emergency medical care. *See Vickers*, 78 F.3d at 143. The Act was never intended to displace state law regarding medical malpractice or negligence. As the Fourth Circuit stressed in *Vickers*, " 'EMTALA is not a substitute for state malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence.' " 78 F.3d at 142 (quoting *Power*, 42 F.3d at 856). "Congress deliberately left the establishment of malpractice liability to state law, limiting EMTALA's role to imposing on a hospital's emergency room the duty to screen all patients as any paying patient would be screened and to stabilize any emergency condition discovered." *Brooks*, 996 F.2d at 711. "Questions regarding whether a physician or other hospital personnel failed properly to diagnose or treat a patient's condition are best resolved under existing and developing state negligence and medical malpractice theories of recovery." *Baber v. Hosp. Corp. of America*, 977 F.2d 872, 880 (4th Cir.1992).

EMTALA's statutory requirements are relatively straightforward. When an individual seeks medical treatment at a hospital's emergency room, "the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department ... to determine whether or not an emergency medical condition (within the meaning of [§ 1395dd(e)(1) ] ) exists." 42 U.S.C. § 1395dd(a).[8] *See generally Vickers*, 78 F.3d at 142. An "appropriate medical screening" includes all "ancillary services routinely available to the emergency department." § 1395dd(a). Once the hospital determines that the individual suffers from an emergency medical condition, the facility either must provide "further medical examination and such treatment as may be required to stabilize the medical condition," § 1395dd(b)(1)(A), or it must transfer "the individual to another medical facility in accordance with [§ 1395dd(c) ]." § 1395dd(b)(1)(B). Failure to follow these

---

**8.** As defined by the statute, an "emergency medical condition," in relevant part, is one "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in (i) placing the health of the individual ... in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction to any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A).

and other provisions of the statute will subject the offending hospital, as well as the treating or certifying physician or physicians, to civil monetary penalties, *see* § 1395dd(d)(1), and the offending hospital (but not the physicians) to actions for damages for personal injuries by individuals harmed thereby. *See* § 1395dd(d)(2).

## V.

In their Second Amended Complaint, Plaintiffs allege that MGH violated several of EMTALA's provisions, but their allegations are reducible to three in number. The Court considers each of these.

## A.

■ Plaintiffs' first claim is that MGH failed to screen adequately Mrs. Bergwall's emergency medical condition in accordance with § 1395dd(a). MGH, they say, failed to perform ancillary medical diagnosis procedures that it routinely makes available in its emergency room to screen cardiac-distressed patients. That omission, in turn, purportedly led MGH to misdiagnose Mrs. Bergwall's emergency medical condition as an evolving acute myocardial infarction. Plaintiffs cite as procedures routinely available at MGH the echocardiogram and right-sided EKG, which were ordered by Dr. Goldberg but never performed, and the cardiac enzyme laboratory tests which, while performed, were allegedly never communicated to physicians involved in Mrs. Bergwall's care. Had those tests been administered and their results transmitted to the doctors, Plaintiffs aver, her screening would have been complete.

MGH denies that its screening was in any way deficient. Dr. Smith, MGH says, properly administered the same medical screening that any similarly-situated cardiac-distressed patient would have received in its facility. This screening, they argue, in fact resulted in an identification of Mrs. Bergwall's perceived emergency medical condition. Any further inquiry into the diagnoses of Drs. Goldberg or Mendhiratta or the tests that they ordered (or failed to conduct) would go to the quality of care rendered and thus fall outside EMTALA's scope.

■ Inasmuch as the heart of an EMTALA claim is unequal treatment between similarly symptomatic patients, in order to comply with the screening requirements § 1395dd(a), a hospital must " 'apply uniform screening procedures to all individuals coming to the emergency room,' " including routinely available ancillary services. *Vickers,* 78 F.3d at 143 (quoting *Matter of Baby K,* 16 F.3d 590, 595 (4th Cir.1994)); *see also Baber,* 977 F.2d at 879 & n. 6. So long as the hospital has offered an emergency patient all its standard medical screening procedures, once the emergency department staff has determined that an emergency medical condition is or is not present, its obligation under Section 1395dd(a) ends. *See* § 1395dd(a) ("[T]he hospital must provide for an appropriate medical screening examination ... to determine whether or not an emergency condition exists."). The hospital's procedures need not be identical to what would be performed in other facilities, but rather are unique to each individual facility. As the Fourth Circuit has explained,

[§ 1395dd(a) ] does not impose on hospitals a national standard of care in screening patients. The screening requirement only requires a hospital to provide a screening examination that is "appropriate" and "within the capability of the hospital's emergency department," including "routinely available" ancillary services. This section establishes a standard which will of necessity be individualized for each hospital, since

hospital emergency departments have varying capabilities.[9]

*Baber,* 977 F.2d at 879–80. Accordingly, the question is whether MGH followed its own standard screening procedures when it initially screened Mrs. Bergwall. *See Repp v. Anadarko Mun. Hosp.,* 43 F.3d 519, 522 (10th Cir.1994) ("We believe that a hospital defines which procedures are within its, capabilities when it establishes a standard screening policy for patients entering the emergency room .... Thus, a hospital violates section 1395dd(a) when it does not follow its own standard procedures."). *See also Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037, 1041 (D.C.Cir.1991) ("[A] hospital fulfills the 'appropriate medical screening' requirement when it conforms in its treatment of a particular patient to its standard screening procedures."); *Cleland v. Bronson Health Care Group, Inc.,* 917 F.2d 266, 272 (6th Cir.1990) (screening requirement met if the hospital "acts in the same manner as it would have for the usual paying patient"). The Court finds, as a matter of law, that it did.

■ The uncontroverted evidence demonstrates that MGH screened Mrs. Bergwall in the same manner that it screened all other patients with similar cardiac

symptoms. According to the affidavit of Mary Barrowman, MGH's Vice President of Quality and Compliance, MGH's standard screening for patients whose symptoms include chest pain, dizziness, bradycardia and hypotension consists of a triage by an emergency room nurse; a detailed interview and physical examination by an emergency physician; and diagnostic tests, including an EKG, a chest x-ray, and serum cardiac markers. Mrs. Bergwall was the beneficiary of these procedures. When she arrived at 12:30 a.m., she was promptly seen by a triage nurse, who noted that she was complaining of chest pains. The nurse also took Mrs. Bergwall's vital signs, recorded her medical history, and indicated the medicines that she was currently taking. Dr. Smith then arrived and conducted an examination consisting of an interview to determine the nature of the patient's present complaints; an evaluation of her major body systems, including her eyes, mouth, neck, chest (heart/lungs), abdomen, upper thigh (femoral artery) and calves; an assessment of her past medical and social history; and a physical examination. The doctor also ordered that certain diagnostic tests be run. These test were performed, and later that morning Dr. Smith arrived at her diagnosis of bradycardia, near syncope and recent myocardial infarction (inferior-posterior).[10] Dr.

---

9. Defining "appropriate medical screening" in terms of the hospitals own medical screening standard pre-supposes a certain element of good faith on the hospital's part. As the Fourth Circuit observed in *Baber,*

hospitals could theoretically avoid liability by providing very cursory and substandard screenings to all patients, which might enable the doctor to ignore an emergency medical condition .... Our holding, however, does not foreclose the possibility that a future court faced with such a situation may decide that the hospital's standard was so low that it amounted to no "appropriate medical screening." We do not decide that question in this case because Ms. Baber's screening was not so substandard as to amount to no screening at all.

977 F.2d at 879 n. 7 (internal citation omitted).

10. Plaintiffs dispute whether Dr. Smith actually diagnosed Mrs. Bergwall with acute myocardial infarction or inferior-posterior infarction. The resolution of this dispute, however, is not germane with respect to this action because EMTALA does not "guarantee that the emergency personnel will correctly diagnose a patient's condition as a result of [a standard medical screening]." *Baber,* 977 F.2d at 879. The fact that a diagnosis was made subsequent to a proper screening is alone sufficient. Of course, any misdiagnosis deviating from a relevant standard of care would still be actionable in negligence under state law.

Smith also confirms that she conducted substantially the same examination she would have performed on any patient in the emergency department with a medical history and complaints similar to those of Mrs. Bergwall.

Plaintiffs' attempt to create a disputed fact over the tests ordered by Dr. Goldberg—but not performed—does not change the outcome. They contend that the echocardiogram and the right-sided EKG were ancillary services routinely available in MGH's emergency room because 1) Dr. Ira Gelb, a board-certified cardiologist, stated that those procedures are strictly diagnostic in nature; and 2) the tests appear on Dr. Goldberg's pre-printed "Routine Cardiac Order." Dr. Gelb's testimony, however, is irrelevant to the question of whether MGH properly screened Mrs. Bergwall because it does not address whether MGH deviated from its own standard procedures. *See Baber*, 977 F.2d at 882 (rejecting an expert's testimony because it concerned only whether the hospital failed to follow a general standard of care, not whether it failed to conform to its own standard emergency protocol). As to Dr. Goldberg's cardiac order, nothing in the record supports the conclusion that such an order was part of the emergency department's routine screening procedure for patients preliminarily diagnosed as was Mrs. Bergwall. Indeed, Mrs. Barrowman, in her affidavit, states that MGH's standard medical screening examination for cardiac patients does not include cardiac catheterizations, echocardiograms or right-sided EKGs. Such procedures are only ordered once an emergency medical condition is determined to exist, not before.

■ The short of the matter is that MGH's alleged failure to diagnose Mrs. Bergwall accurately with an evolving acute myocardial infarction cannot form the ba-sis of an EMTALA claim. As the Fourth Circuit noted in *Baber*,

> Although evidence challenging the adequacy of a screening examination may be sufficient to withstand summary judgment in a medical malpractice action, it is not sufficient to establish an EMTALA violation under § 1395dd(a). The critical element of an EMTALA cause of action is not the adequacy of the screening examination but whether the screening examination that was performed deviated from the hospital's evaluation procedures that would gave been performed on any patient in a similar condition.

977 F.2d at 881. This teaching applies in the present case. Although the issue of whether MGH should have included certain additional tests as part of its routine diagnostic evaluation may be relevant to a malpractice claim, it does not implicate a question of federal law. The sole consideration bearing on the EMTALA claim is whether MGH followed its standard screening procedures in examining Mrs. Bergwall. The Court finds, as a matter of law, that it did.

### B.

■ Plaintiffs also contend that MGH failed to stabilize Mrs. Bergwall prior to transfer, as required by § 1395dd(b) of the Act. They claim this was so because Mrs. Bergwall was hemodynamically imbalanced, *i.e.*, her blood circulation was abnormal as evidenced by the pain she was suffering, and because MGH failed to pursue appropriate ancillary procedures. Additionally, Plaintiffs argue that MGH failed to comply with EMTALA's transfer provisions because Dr. Mendhiratta did not sign a transfer certification as of the time when Mrs. Bergwall was moved. § 1395dd(c). The certification occurred several hours before the ambulance took Mrs. Bergwall to WHC, an unreasonable delay that Plaintiffs say also violated the Act.

MGH's position is that Mrs. Bergwall was both stabilized and appropriately certified for transfer. Even if both Dr. Goldberg and/or Dr. Mendhiratta failed to diagnose Mrs. Bergwall's "evolving acute myocardial infarction," MGH argues that the doctors still diagnosed her as having an acute coronary syndrome. They still made a determination, based on what they judged to be a reasonable medical probability, that her condition would not materially deteriorate during a transfer to WHC. If the doctors were in error—if they deviated from a relevant standard of care as to their diagnosis or proposed treatment of the diagnosed condition—they may be subject to state causes of action for malpractice. But, there can be no EMTALA liability. Moreover, MGH asserts that it cannot be liable for any delay in effectuating the patient's transfer because Mrs. Bergwall could not be moved until a space became available at WHC. In fact, as soon as it did become available, she was moved as required by the statute. Finally, MGH believes it cannot be held responsible for delays before the ambulance arrived. At most, any delay between the time MGH's doctors signed off on the transfer to WHC and when Mrs. Bergwall was ultimately moved, MGH argues, was not its responsibility but the responsibility of Kaiser Permanente, whose own procedures prevented a transfer until WHC was ready to accept the patient.

■■■ Under EMTALA, "[o]nce an individual has been diagnosed as presenting an emergency medical condition, the hospital must provide that treatment necessary to prevent the material deterioration of the individual's condition [i.e., stabilize the individual] or provide for an appropriate transfer to another facility." *Matter of Baby K*, 16 F.3d at 594. An individual has a "stabilized" emergency medical condition when "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." § 1395dd(e)(3)(B).[11]

■■■ Stabilizing a patient does not mean treating the patient's emergency medical condition in full. Under the Act, stabilization requires only that the physician determine, within a reasonable degree of medical probability, that the individual's emergency condition is not likely to deteriorate materially during the transfer. The Act does not dictate that the hospital fully cure the patient's ailment before moving or discharging her. *See Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir. 1991); *Nieves v. Hosp. Metropolitano*, 998 F.Supp. 127, 133 (D.P.R.1998). Indeed, consistent with the Act, a patient's condition may be critical and yet still be considered stable. *See St. Anthony Hosp. v. United States Dep't of Health & Human Servs.*, 309 F.3d 680, 694 (10th Cir.2002); *Brooker*, 947 F.2d at 415. Moreover, the propriety of the stabilization for purposes of the Act is measured against the actual diagnosis of the patient's condition, even if that diagnosis was in fact erroneous. Stabilization is not measured against the correct diagnosis of the patient's condition. *See Vickers*, 78 F.3d at 145 (finding sufficient stabilization under EMTALA when the hospital treated the diagnosed emergency medical condition—a head laceration—rather than plaintiff's actual injury—a severe head fracture). Finally, in determining whether an individual was properly stabilized, a court examines "the patient's condition at the time of the transfer or

---

11. Similarly, "to stabilize" the patient, a hospital must "provide such medical treatment as may be necessary to assure, within reasonable medical probability, that no material de- terioration of the condition is likely to result from or occur during the transfer of the individual." § 1395dd(e)(3)(A).

discharge." *Nieves*, 998 F.Supp. at 133 (citing *Cleland*, 917 F.2d at 271). Analysis by hindsight cannot lead to the imposition of liability under the Act. *See Baber*, 977 F.2d at 883.

In the present suit, there can be no dispute that when Drs. Goldberg and Mendhiratta first determined to transfer Mrs. Bergwall in the afternoon of April 9, 1999, they believed, within a reasonable degree of medical probability, that her condition would not materially deteriorate during the transfer to WHC. They made the judgment cognizant of her intermittent chest pain and the cardiac symptoms she presented. As of the time of the certification for transfer, therefore, Mrs. Bergwall was "stable" within the meaning of the Act. The problem, if any, arises out of the fact that Mrs. Bergwall did not actually depart MGH until 9:30 p.m., considerably after her physician certified her as stable, and without having been examined by a physician between 5:00 p.m. and 9:30 p.m., when the ambulance arrived. The inquiry, then, is whether, within the meaning of the Act, Mrs. Bergwall can be deemed to have been as stable at 9:30 p.m. as she was at 5:00 p.m.

To support its contention that Mrs. Bergwall was properly stabilized at the time of transfer, MGH cites the testimony of multiple experts who agree that her condition remained materially unchanged, indeed actually improved, during the time between the decision to move her and her actual transfer.[12] In addition, MGH points out that the medical charts of the nursing staff do not mention deterioration in the patient's condition. Although Mrs. Bergwall complained of "slight chest discomfort" around 1:15 p.m., she also indicated to the nurse that she was "feeling better" and, upon examination, appeared to be alert and in no distress. Thereafter, between 2:00 p.m. and 9:30 p.m., the nursing staff took her vital signs approximately once every hour, documenting no changes in her condition or stability. At 8:40 p.m., and again at 9:30 p.m., Mrs. Bergwall was still noted by the nursing staff as being in no acute distress. Between the hours of 1:00 p.m. to 9:30 p.m, her blood pressure became stronger, increasing from 86/52 to 125/62. Moreover, during the afternoon and evening, Mrs. Bergwall left her bed without incident and ate dinner without difficulty.[13]

Plaintiffs, in contrast, rely upon the deposition testimony of two medical experts who opine that Mrs. Bergwall's condition was unstable.[14] Dr. Gelb indi-

---

12. One of these experts, Dr. Alan Wasserman, Chairman of the Department of Medicine at George Washington University and board-certified in the fields of cardiology and internal medicine, based his decision on the fact that Mrs. Bergwall's blood pressure, pulse and respiration all increased throughout the day, that her other vital signs remained unchanged during the afternoon and evening, and that she was able to move around and leave her bed. Dr. Thomas Mayer, Chairman of the Emergency Department at Inova Fairfax Hospital and board-certified in emergency room medicine, testified to similar effect in his affidavit.

13. Even one of Plaintiffs' experts, Dr. Michael Cooperman, even appears to concede that Mrs. Bergwall was appropriately stable for transfer. When asked on deposition whether Mrs. Bergwall was stable enough for transfer in his opinion, Dr. Cooperman stated, "I think she was stable for transfer almost during the whole—almost during the whole hospitalization period."

14. Plaintiffs Carla Holway and Cynthia Teed, two of Mrs. Bergwall's adult children, offer their own testimony that their mother was experiencing pain and neurological deterioration prior to her transfer. Such non-medically-based testimony, however, is not admissible on the issue of stabilization. EMTALA requires that the decision regarding material deterioration be based on the reasonable medical probability standard as judged by a

cates that during Mrs. Bergwall's time at MGH and prior to her transfer, she was not adequately stabilized because she was not hemodynamically stable. This testimony, however, does not further Plaintiffs' case. The doctor's medical definition of stability fails to track the provisions of the Act, which requires only the provision of such medical treatment as may be necessary to assure, within a reasonable medical probability, that no material deterioration is likely to result from or occur during the transfer. *See* §§ 1395dd(e)(3)(A) & (B). *See also Brooker,* 947 F.2d at 415 (patient may be transferred consistent with the Act while remaining in critical condition). Indeed, Dr. Gelb conceded that he had no knowledge of EMTALA's requirements for properly stabilizing an individual for transfer purposes.

■ Dr. Daniel Sullivan, who does possess a working knowledge of EMTALA, states that Mrs. Bergwall cannot be deemed to have been stable within the meaning of the Act if certain factors are taken into account, including her coronary artery disease, multiple episodes of bradycardia, low blood pressure, recurrence of chest pains, and periods of shortness of breath. As a result, Dr. Sullivan concludes that Mrs. Bergwall could not have been transferred without the likelihood of a material deterioration in her medical condition and that "no clinician could say within a reasonable clinical probability that this woman could go anywhere without a likelihood of material deterioration in her clinical condition." But saying this is so does not make it so. Indeed, MGH's two

board-certified experts opine in precisely the fashion Dr. Sullivan says no clinician could. Although attractive at first glance, Dr. Sullivan's testimony, on review, also lends no aid to Plaintiffs' claim. In essence, he does no more than question the judgments of Drs. Goldberg and Mendhiratta both as to their diagnosis and their conclusion that Mrs. Bergwall was stable for purposes of transfer.[15] But, as indicated above, stabilization for purposes of the Act requires only that the physician make a good-faith judgment, within a reasonable degree of medical probability, that (given the physician's diagnosis, which may be erroneous) the patient has been stabilized. It does not require that all or even most physicians be in accord that such a degree of reasonable probability was present. Arguably, MGH and its physicians could have done more to stabilize the Mrs. Bergwall. But, to repeat, "EMTALA is not a substitute for state malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence." *Vickers,* 78 F.3d at 142 (quoting *Power,* 42 F.3d at 856). Dr. Sullivan's testimony does not provide a basis to contest that Mrs. Bergwall at the time of her transfer was properly stabilized, as defined in EMTALA.

## C.

Once a physician determines that a patient's condition is stable, the patient may be lawfully transferred without following EMTALA's provisions. *See* § 1395dd(c)(1) (transfer provisions apply

medical professional, not based on the judgment of a layman. *See* §§ 1395dd(e)(3)(A) & (B).

**15.** A statement from Dr. Sullivan's deposition is characteristic:

[I]f Dr. Mendhiratta said [Mrs. Bergwall] was stable for transfer, Dr. Mendhiratta doesn't understand EMTALA, and *I would*

*question her clinical judgment* .... Before [Mrs. Bergwall] would meet the definition of stability under EMTALA, she would need vital signs that were above where they were for some period of time. For example, if she got up to 130/80 and stayed there for two or three hours, you might say that her blood pressure had stabilized. (emphasis added)

only "[i]f an individual at a hospital has an emergency medical condition *which has not been stabilized*") (emphasis added). *See also St. Anthony Hosp.,* 309 F.3d at 694–95; *Cherukuri v. Shalala,* 175 F.3d 446, 450 (6th Cir.1999) ("[A] physician may transfer any emergency room patient to another hospital without any certifications and without the express consent of the receiving hospital if he reasonably believes that the transfer is not likely to cause a material deterioration of the patient's condition."). Because the Court finds that Mrs. Bergwall was appropriately stabilized at the time of her transfer, it need not reach the issue of whether MGH properly complied with the transfer provisions of the Act.[16]

### VI.

The allegations in this case illustrate rather well why, consistent with the Act's purposes, EMTALA claims do not lie here, whereas state medical malpractice claims perhaps do. If Mrs. Bergwall's screening was deficient, it was not lacking by the terms of MGH's own standards. If her stabilization was inappropriate given her actual medical condition, it was nevertheless appropriate given the medical condition with which she was diagnosed. In other words, there is no evidence that MGH inadequately screened or deliberately neglected stabilization procedures to suggest that it was attempting to avoid attending to Mrs. Bergwall because she was unable to pay, EMTALA's primary concern. Even so, to the extent that the hospital's screening or stabilization procedures may have deviated from a broader standard of care, Plaintiffs retain the option of pursuing relief under state laws pertaining to medical malpractice.

### VII.

The Court will GRANT Defendant MGH's Renewed Motion for Summary Judgment of the EMTALA Claim and Transfer of the Negligence Action.

A separate Order will be ENTERED.

### *ORDER*

Upon consideration of Defendant MGH Health Services Inc.'s Renewed Motion for Summary Judgment of the EMTALA Claim and Transfer of the Negligence Action and Plaintiffs' opposition thereto, it is, for the reasons set forth in the accompanying Opinion, this 20 day of December, 2002,

ORDERED

1) Defendant's Renewed Motion for Summary Judgment of the EMTALA Claim and Transfer of the Negligence Action [Paper No. 34] is GRANTED;

2) Summary Judgment is ENTERED in favor of Defendant MGH and against Plaintiffs; and

3) The Clerk SHALL close this case.

---

16. As for the delay in effectuating the transfer to WHC, MGH cannot be held responsible. That decision, for better or worse, was controlled by Kaiser Permanente, and/or WHC and/or the ambulance company, not by MGH.