Richard **FRAZIER**, Jr., Plaintiff,

v.

**ANGEL MEDICAL CENTER, a corporation; Executive Risk Indemnity Insurance Co., Inc., Policy No. 8168–5451; Nelson P. Davis, M.D.; Bruce Portner, M.D.; Christeen Kaga, M.D.; Gilberto Robels, M.D.; Scott M. Petty, M.D.; Unknown and Unnamed John and Jane Does; Private Medical Corporation or Physicians Professional Corporation, their insurer and unknown entity to be named when known to Plaintiff, Defendants.**

No. CIV. 2:03CV25.

United States District Court,
W.D. North Carolina,
Bryson City Division.

March 16, 2004.

Richard Frazier, Jr., Atlanta, GA, pro se.

Sharon L. Parker, Phillip T. Jackson, Dameron, Burgin & Parker, P.A., Marion, NC, James W. Williams, Jacqueline D. Grant, Roberts & Stevens, P.A., Isaac N. Northup, Derrick R. Bailey, Northup & McConnell, PLLC, Asheville, NC, Andrew C. Buckner, Womble, Carlyle, Sandridge and Rice, Winston–Salem, NC, George R. Ragsdale, Ragsdale Liggett, Raleigh, NC, for Defendant.

### *MEMORANDUM AND ORDER OF DISMISSAL*

THORNBURG, District Judge.

**THIS MATTER** is before the Court on the following motions:

1. the motion to strike and dismiss of Defendant Angel Medical Center (An-gel), filed April 14, 2003, and amended April 17, 2003;

2. the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) of Defendant Nelson Parke Davis, M.D. (Dr. Davis), filed April 14, 2003;

3. the motion to dismiss pursuant to Rule 12(b)(6) of Defendants Christeen Kaga, M.D. (Dr. Kaga), Gilberto Robels, M.D. (Dr. Robels), and Scott M. Petty, M.D. (Dr. Petty), filed April 23, 2003;

4. the motion to dismiss of Defendant Bruce Portner, M.D. (Dr. Portner), filed April 23, 2003;

5. Dr. Davis' motion to dismiss the amended complaint, filed September 22, 2003;

6. Dr. Portner's motion to dismiss the amended complaint, filed September 22, 2003;

7. Angel's motion to disallow the appointment of power of attorney, filed September 23, 2003;

8. Angel's motion to dismiss the constitutional and state law claims, filed September 23, 2003; [1]

9. Angel's motion to dismiss the Emergency Medical Treatment and Active Labor Act (EMTALA) claim, filed September 23, 2003;

10. Angel's motion to dismiss the medical malpractice claim, filed September 23, 2003;

11. the motion of Drs. Kaga, Robels and Petty to dismiss the amended complaint, filed September 23, 2003, and amended October 9, 2003;

12. Plaintiff's motion requesting an extension of time to effect service, filed October 8, 2003;

---

**1.** It is noted that Angel did not file one motion to dismiss which included all of the claims sought to be dismissed. Instead, Angel filed numerous motions to dismiss. This practice is not allowed in this Court and counsel is cautioned against such filings in the future.

13. the motion to dismiss of Defendant Executive Risk Indemnity Insurance Co., Inc. (Executive), filed October 17, 2003; and

14.. Dr. Petty's motion for an order of dismissal, filed November 17, 2003.

## I. ALLEGATIONS OF THE COMPLAINT

On August 14, 2003, Plaintiff filed his amended complaint which alleges that during the early morning hours of November 1, 2000, his car hit a telephone pole when he was involved in a high speed automobile chase while fleeing law enforcement authorities. **Complaint, filed August 14, 2003, at 4.** Plaintiff was transported by ambulance to Angel where he was treated in the emergency room. *Id.* Plaintiff has attached copies of his medical records to his amended complaint. Those records show that Dr. Petty conducted radiology studies of the Plaintiff's left ankle, left femur, pelvis, chest and spine as a result of the accident on November 1, 2000. Dr. Petty diagnosed a severe fracture of the Plaintiff's left heel. It was noted that the Plaintiff had not been wearing his seatbelt at the time of the accident, at which time he was going approximately 60 miles per hour. He sustained lacerations to his forehead and nose, which were sutured, and he had a blood alcohol content of 113. Although there was some consideration of transferring the patient to another hospital for an orthopedic consultation, the hospital was unable to find one which would accept such a transfer. As a result, Dr. Kaga, who was the orthopedic surgeon on call that morning, treated the Plaintiff and noted the following in her progress notes:

I talked to the patient at length regarding his calcaneal[2] injury. I explained that this is a very serious injury and very prone to chronic residual pain as well as post-traumatic arthritis even

with good and adequate internal fixation. I explained that normally at his age, open reduction internal fixation would be recommended and *still may be in the future once his swelling is down and risks of skin complication and infection are reduced.* I recommended a bulky compressive dressing and splint for the lower extremity, elevation at all times above the heart, and then re-evaluation in five days this coming Monday to see if the swelling is improved.

. . . . .

The patient will be discharged from the emergency room. He is given written and verbal instructions which are carefully reviewed with him. He will keep the splint clear and dry. He will keep his left foot elevated above the heart at all times.... [H]e has an appointment this coming Monday, 11/06/00 at noon. *We will re-evaluate him at that time and see if the swelling is improved.*

**Progress Notes** *attached to* **Complaint (emphasis and footnote added).** At the time the Plaintiff was released from the emergency room, he was taken into custody by the United States Marshal's Service and ultimately delivered to law enforcement authorities in Georgia. At the time this action was filed, the Plaintiff was a federal inmate in Atlanta, Georgia.

Plaintiff raises the following claims: (1) negligence; (2) a violation of the EMTALA; (3) negligent hiring; (4) deliberate indifference to a serious medical need and a conspiracy among Angel and the law enforcement authorities to deprive him of adequate medical care; and (5) medical malpractice. In response to the Defendants' motions, the Plaintiff has acknowledged that Dr. Petty was erroneously joined as a defendant and has committed no malpractice.

---

**2.** Heel. *Dorland's Illustrated Medical Dictio-* *nary* (28th ed.1994).

## II. STANDARD OF REVIEW

" 'A complaint should not be dismissed for failure to state a claim upon which relief may be granted unless after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief.' " *De'Lonta v. Angelone,* 330 F.3d 630, 633 (4th Cir. 2003) (quoting *Veney v. Wyche,* 293 F.3d 726, 730 (4th Cir.2002)).

## III. DISCUSSION

■■■ It is first noted that the substan-· tive elements of a medical malpractice action are determined by state law in a federal diversity action. *Fitzgerald v. Manning,* 679 F.2d 341, 346 (4th Cir.1982). North Carolina state law defines a medical malpractice action as "a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." Doctors, nurses, and hospitals all qualify as health care providers. To prevail on a medical malpractice claim in North Carolina, a plaintiff must establish: (1) the applicable standard of care; (2) the defendant's breach of that standard; and (3) that the breach caused the plaintiff's injury. The standard of care for claims arising from medical treatment in North Carolina provides:

> the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

Because this statute does not abrogate common law duties, health care providers must also exercise reasonable care and diligence in providing services and use their best judgment in the treatment and care of patients.

*Wright v. United States,* 280 F.Supp.2d 472, 477 (M.D.N.C.2003) (quoting N.C. Gen.Stat. §§ 90–21.11, 21.12) (other internal citations omitted). In North Carolina, a plaintiff's malpractice complaint must assert that "the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness" as required by the North Carolina Rules of Civil Procedure for medical malpractice actions. *Moore v. Pitt County Mem'l Hosp.,* 139 F.Supp.2d 712, 713 (E.D.N.C. 2001); *Bass v. Durham County Hosp. Corp.,* 358 N.C. 144, 592 S.E.2d 687 (2004). Rule 9(j) of those rules provides that

> [a]ny complaint alleging medical malpractice by a health care provider . . . in failing to comply with the applicable standard of care . . . *shall be dismissed* unless:
>
> (1) The pleading specifically asserts that the medical care has been reviewed by a person who is reasonably expected to qualify as an expert witness under Rule 702 of the Rules of Evidence and who is willing to testify that the medical care did not comply with the applicable standard of care;
>
> . . . . .
>
> ■■■ (3) The pleading alleges facts establishing negligence under the existing common-law doctrine of *res ipsa loquitur.*

N.C. Gen.Stat. § 1A–1, Rule 9. Thus, failure to include such a certification in the complaint will result in dismissal unless the complaint states a cause of action for

negligence pursuant to the doctrine of *res ipsa loquitur*. *Bass, supra.*

▇▇▇▇ Here, the Plaintiff admits that no certification has been submitted because he relies solely on the doctrine of *res ipsa loquitur*. "[T]he pleadings have a binding effect as to the underlying theory of plaintiff's negligence claim." *Anderson v. Assimos*, 356 N.C. 415, 417, 572 S.E.2d 101, 102 (2002). "*Res ipsa loquitur* claims are normally based on facts that permit an inference of defendant's negligence." *Id.*, 572 S.E.2d at 103. The doctrine "permits a fact finder 'to infer negligence from the mere occurrence of the accident itself' based on common knowledge or experience." *Wright*, 280 F.Supp.2d at 481 (quoting *Diehl v. Koffer*, 140 N.C.App. 375, 378, 536 S.E.2d 359, 362 (2000)).

> In medical malpractice actions, *res ipsa loquitur* applies if the injurious result rarely occurs standing alone and is not an inherent risk of the operation. The doctrine is reserved, however, "for those situations in which a physician's conduct is so grossly negligent or treatment is of such nature that the common knowledge of laypersons is sufficient to find [the essential elements]."... When treatment results in an injury to an area implicated in the surgical field, however, common knowledge does not support an inference of negligence in North Carolina. [*R* ]*es ipsa loquitur* rarely is appropriate in medical malpractice actions. Courts have demonstrated an "awareness that the majority of medical treatment involves inherent risks which even adherence to the appropriate standard of care cannot eliminate."

*Id.* (quoting *Bailey v. Jones*, 112 N.C.App. 380, 387, 435 S.E.2d 787, 792 (1993); *Schaffner v. Cumberland County Hosp. Sys., Inc.*, 77 N.C.App. 689, 692, 336 S.E.2d 116, 118 (1985)) (other internal citations omitted). At issue here is whether the doctrine can be applied to a situation

in which a treating specialist provides the initial emergency care and instructs the patient to return for follow-up care. "The answer to this question is obviously not a matter of common knowledge nor does it warrant the presumption created by applying the doctrine of *res ipsa loquitur*. Thus, under the general rule, plaintiff was required to produce expert testimony to establish a prima facie case on his medical malpractice claim." *Warden v. United States*, 861 F.Supp. 400, 403 (E.D.N.C. 1993), *aff'd*, 25 F.3d 1042 (4th Cir.1994) (Decision to treat prisoner's condition as a non-emergency is not a matter susceptible of decision as a matter of common knowledge, thus, *res ipsa loquitur* does not apply.); *Ballance v. Wentz*, 22 N.C.App. 363, 368, 206 S.E.2d 734, 737 (1974) (*Res ipsa loquitur* cannot be relied on to determine whether good orthopedic practice was used in the treatment, care and supervision of the plaintiff.).

▇▇▇▇ There remains, however, the allegation of the complaint that Angel was negligent in the hiring of the doctors who treated the Plaintiff. "[C]orporate negligence actions brought against a hospital which pertain to clinical patient care constitute medical malpractice actions; however, where the corporate negligence claim arises out of policy, management or administrative decisions, ... the claim is instead derived from ordinary negligence principles." *Estate of Waters v. Jarman*, 144 N.C.App. 98, 103, 547 S.E.2d 142, 145 (2001). Where the claim is based on the failure of an emergency room physician to provide adequate care, the case is actually a medical malpractice case which requires a certification. *Id.*, at 102, 547 S.E.2d at 145 (quoting *Paris v. Kreitz*, 75 N.C.App. 365, 331 S.E.2d 234 (1985)) (" 'There is no evidence of a standard by which the Hospital's handling of the case could be judged by a jury.' "); *Iodice v. United States*, 289 F.3d 270, 276–77 (4th Cir.2002). Such is

the case here. The Plaintiff "failed to *allege facts* sufficient to *state* elements of such a claim. Even in these days of notice pleadings, a complaint asserting a negligence claim must disclose that each of the elements is present in order to be sufficient." *Id.,* at 281 (internal quotations omitted). Although the complaint is couched in terms of negligent hiring, the only allegation is that the Plaintiff should have received different or additional treatment. That is a claim which sounds in malpractice, not ordinary negligence.

 Plaintiff also alleges that he was discharged prior to having his condition stabilized in violation of the EMTALA, 42 U.S.C. § 1395dd, *et seq.* The statute provides in pertinent part:

> In the case of a hospital that has a hospital emergency department, if any individual ... comes to the emergency department and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition ... exists.

> If any individual ... comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either-
>> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>> (B) for transfer of the individual to another medical facility ....

42 U.S.C. § 1395dd(a), (b).

 The Plaintiff's medical records show that when Dr. Kaga learned the extent of the fracture of the Plaintiff's left heel, she initially considered transferring him to a facility which would have specialized treatment. The emergency room physician followed up on that suggestion; however, the hospital representative in Gainesville, Georgia, felt Angel was obligated to stabilize the Plaintiff prior to any transfer. Another hospital representative at Emory University Hospital in Atlanta, Georgia, felt that no orthopedic care was indicated at the time. When Dr. Kaga came out of surgery, she learned, however, that the emergency room physician had already had a surgery consultation and had been unsuccessful in finding a transfer facility. Dr. Kaga then discussed his injury with the Plaintiff and advised that surgery would most likely be necessary once the swelling had decreased. She scheduled a follow-up appointment after treating his foot. From this language in the medical records, the Plaintiff presumes that he was not stabilized within the meaning of the statute.

EMTALA is a limited "anti-dumping" statute, not a federal malpractice statute. Its core purpose is to get patients into the system who might otherwise go untreated and be left without a remedy because traditional medical malpractice law affords no claim for failure to treat. Numerous cases and the Act's legislative history confirm that Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons. *Once EMTALA has met that purpose of ensuring that a hospital undertakes stabilizing treatment for a patient who arrives with an emergency condition, the patient's care becomes the legal responsibility of the hospital and the treating physicians. And, the legal adequacy of that care is then governed not by EMTALA but by the state malpractice law that everyone*

agrees *EMTALA was not intended to preempt.*

*Bryan v. Rectors and Visitors of Univ. of Virginia,* 95 F.3d 349, 351 (4th Cir.1996) (internal citations omitted). Here, the Plaintiff claims he was not stabilized because he was not transferred. However, the statute defines stabilization as the provision of "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual . . . ." *Id.,* at 352 (quoting 42 U.S.C. § 1395dd(e)(3)(A)).

> It seems manifest . . . that the stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of the act of admitting [Plaintiff] for emergency treatment and while it considered whether it would undertake longer-term full treatment or instead transfer the patient to a hospital that could and would undertake that treatment. It cannot plausibly be interpreted to regulate medical and ethical decisions outside that narrow context.

*Id.* The Plaintiff's condition was clearly stabilized and Dr. Kaga offered to provide long term treatment. The fact that the Plaintiff was unable to return for such treatment due to his incarceration does not mean that either Dr. Kaga or the hospital "abandoned" him. However, even if such were the case, abandonment is a state law tort, not a federal cause of action pursuant to the EMTALA. *Id.* The statute " 'is not a substitute for state law malpractice actions, and was not intended to guarantee proper diagnosis or to provide a federal remedy for misdiagnosis or medical negligence.' " *Trivette v. N.C. Baptist Hosp., Inc.,* 131 N.C.App. 73, 75, 507 S.E.2d 48, 50 (1998) (quoting *Power v. Arlington Hosp. Ass'n,* 42 F.3d 851, 856 (4th Cir. 1994)).

Assuming *arguendo* that the Plaintiff's argument is that surgery should have been performed before his discharge from the emergency room, he still fares no better. The failure to provide surgical intervention at that time would be a matter of malpractice, not failure to stabilize. *Id.; accord, Vickers v. Nash Gen. Hosp., Inc.,* 78 F.3d 139 (4th Cir.1996) (Treatment of head injury by x-rays and sutures sufficient despite the fact that additional tests would ultimately have saved the plaintiff's life.). "Stabilizing a patient does not mean treating the patient's emergency medical condition in full." *Bergwall v. MGH Health Servs., Inc.,* 243 F.Supp.2d 364, 374 (D.Md.2002). Moreover, to the extent the Plaintiff has attempted to state an EMTALA claim against the physicians, no such claim exists because the statute provides an action for personal injury damages only against a hospital. *Baber v. Hosp. Corp. of America,* 977 F.2d 872 (4th Cir.1992); *Bergwall, supra.*

The only claim remaining is the Plaintiff's claim for conspiracy to deprive him of medical care and deprivation thereof. That claim is based on the Plaintiff's allegation that law enforcement authorities preferred he be transferred to a Georgia hospital. However, since that did not occur, he has failed to state a claim. Nor would he prevail in any event.

> In *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251[ ] (1976), the Supreme Court held that prison officials violate the Eighth Amendment when they are deliberately indifferent to the serious medical needs of their prisoners. Pretrial detainees are entitled to at least the same protection under the Fourteenth Amendment as are convicted prisoners under the Eighth Amendment. Thus, deliberate indifference to the seri-

ous medical needs of a pretrial detainee violates the due process clause.

. . . . .

Deliberate indifference is a very high standard—a showing of mere negligence will not meet it. Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care.

. . . . .

 Negligence, however, is insufficient to support a claim of a Fourteenth Amendment violation. To be sure, the . [ ] complaint throws in words and phrases such as "deliberate indifference," "malicious," "outrageous," and "wanton" when describing the conduct of the [Defendants]. The presence, however, of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint cannot support a finding of deliberate indifference.

*Young v. City of Mount Ranier,* 238 F.3d 567, 575–78 (4th Cir.2001) (internal quotations and citations omitted). The most that can be said of the Plaintiff's claims is that he has raised the specter of medical malpractice. That is a far cry from deliberately ignoring a serious need for medical care. To the contrary, the Plaintiff was provided with medical care. The fact that he did not return for follow-up treatment with Dr. Kaga is hardly a fact which can be used to argue that any Defendant was deliberately indifferent to his medical needs. "Deliberate indifference requires, at a minimum, that the defendant thought about the matter and chose to ignore it. It may appear when prison officials deny, delay, or intentionally interfere with medical treatment." *Harden v. Green,* 27 Fed. Appx. 173, 178, 2001 WL 1464468 (4th Cir.2001); *Rish v. Johnson,* 131 F.3d 1092,

1096 (4th Cir.1997) (The prisoner must show "that a prison official actually [knew] of and disregard[ed] an objectively serious condition, medical need, or risk of harm."). That is not the case here. Since there has been no showing of deliberate indifference to a serious medical need, the Plaintiff cannot make out a case of conspiracy.

## IV. ORDER

**IT IS, THEREFORE, ORDERED** that Plaintiff's claims based on medical malpractice against the Defendants are hereby **DISMISSED** with prejudice; and

**IT IS FURTHER ORDERED** that Plaintiff's remaining · claims are hereby **DISMISSED** with prejudice; and

**IT IS FURTHER ORDERED** that, to the extent other pending motions have not been specifically addressed by this Order, they are hereby **DENIED** as moot.