**Willis WRIGHT and Elaine Helen Troxler Wright, Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. 1:01CV00700.**

United States District Court, M.D. North Carolina.

Aug. 28, 2003.

Lawrence Egerton, Jr., Egerton & Associates, Greensboro, NC, Lawrence H. Brenner, Chapel Hill, NC, for Plaintiffs.

Gill P. Beck, Lynne P. Klauer, Office of U.S. Attorney, Greensboro, NC, for Defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

Plaintiff Willis Wright alleges that Defendant's negligence caused pain and numbness in his back following prostate surgery at the Durham Veterans Adminis-

tration Medical Center ("DVAMC") in Durham, North Carolina. Mr. Wright's wife, Elaine Helen Troxler Wright, claims loss of consortium. The matter comes before the court following a bench trial on April 7, 2003. Having considered the evidence, arguments, and submissions of the parties, the court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Willis Wright was a United States Marine from 1966 to 1970 and saw combat in the Vietnam War. This experience rendered Mr. Wright 100% disabled due to post-traumatic stress disorder and exposure to Agent Orange. The prostate cancer that precipitated the surgery at issue was caused by Agent Orange exposure during Mr. Wright's military service in Vietnam.

2. Mr. Wright underwent a radical retropubic prostatectomy for the treatment of prostate cancer on June 24, 1998, at DVAMC. The attending physician was Dr. Cary N. Robertson, a urologic oncologist and surgeon at Duke University Medical Center. Dr. Stanley Hall, who was beginning his sixth and final year as a urology resident at Duke University Medical Center, also participated in the surgery. Under an agreement between DVAMC and Duke University, Duke University faculty have privileges at DVAMC and residents do multiple four-month rotations there.

3. Mr. Wright's surgery began at 9:53 a.m. and concluded at 2:05 p.m., a duration within the normal range for such a procedure. At the time of the surgery, Mr. Wright was 71 inches tall and weighed 290 pounds. He was anesthetized, rendering him unconscious throughout the procedure. Mr.

Wright was positioned on his back on a flexed operating table, which was capable of bearing 350 pounds and was equipped with a 2¼″ thick surgical table pad. A small padded roll was placed beneath Mr. Wright's back to provide additional exposure of the surgical field. Except for the padded table and the small padded roll, no supplemental padding was provided under Mr. Wright's back or buttocks. Mr. Wright's extremities were adequately padded. The positioning and padding of Mr. Wright was typical for a radical retropubic prostatectomy procedure.

4. Surgical positioning is at the discretion and direction of the surgeon performing the operation. Nurses and other members of the surgical team who assisted in positioning and padding Mr. Wright did so under the direction of the surgeons.

5. The surgery successfully removed Mr. Wright's prostate cancer. Mr. Wright did experience, however, the common side effect of impotence. This result was not caused by negligence, and Plaintiffs do not allege as much.

6. Mr. Wright began experiencing severe pain in his lower back immediately after the anesthesia subsided, and he continues to experience pain and weakness in his left lower back and leg. Imaging and nerve conduction studies subsequently confirmed nerve damage in Mr. Wright's back and pelvic area. The nerve damage suffered by Mr. Wright is a known, but rare consequence of radical retropubic prostatectomy surgery and caused substantial, significant, and prolonged pain.

7. Mr. Wright was deemed 100% disabled in 1993 and has been incapable of working since then. Mr. Wright also received a 40% disability rating for the back injury he suffered as a result of surgery, but he received no additional compensation for his back injury from the United States because of his previous 100% disability rating. The Veterans Administration provides Mr. Wright with all of his medical care at no cost to him; therefore, he has no medical expenses. Because his previous disability renders him incapable of working, he claims no lost earnings.

## DISCUSSION

 Plaintiffs bring this medical malpractice action against DVAMC under the Federal Tort Claims Act.[1] Claims filed under the Act are governed by the substantive law of the state in which the alleged tort occurred. 28 U.S.C. § 1346(b); *Shumaker v. United States*, 714 F.Supp. 154, 158 (M.D.N.C.1988). Thus, the court follows federal rules in deciding procedural questions but applies North Carolina's substantive law of negligence. *Id.* In applying state law, the court must rule as North Carolina courts would, treating decisions of the state supreme court as binding and departing from "an intermediate court's fully reasoned holding as to state law only if 'convinced' that the state's highest court would not follow that holding." *Iodice v. United States*, 289 F.3d 270, 275 (4th Cir.2002) (quoting *Assicurazioni Generali, S.p.A. v. Neil*, 160 F.3d 997, 1003 (4th Cir.1998)).

To prevail, Plaintiffs bear the burden of proving each element of their claims by a preponderance of the evidence. Plaintiffs

---

1. The Federal Tort Claims Act exposes the United States to liability "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, and grants federal district courts jurisdiction over claims properly filed according to its provisions. 28 U.S.C. § 1346(b).

claim negligence by DVAMC, which is a health care provider under North Carolina law. *Moore v. Pitt County Mem'l Hosp.*, 139 F.Supp.2d 712, 713 (E.D.N.C.2001); *Estate of Waters v. Jarman*, 144 N.C.App. 98, 101–02, 547 S.E.2d 142, 144–45 (2001). They allege that Defendant, through its agents, failed to properly position Mr. Wright during surgery, failed to recognize that his position on the table for four hours placed him at risk of injury, failed to properly monitor his position on the table and to take steps to avoid injury, and failed to properly detect and manage the injury. These claims rely on two theories: medical malpractice for breach of the applicable standard of care, and negligence under the common law doctrine of *res ipsa loquitur*.[2] The court addresses each issue in turn.

### A. Medical Malpractice

■ North Carolina state law defines a medical malpractice action as "a civil action for damages for personal injury or death arising out of the furnishing or failure to furnish professional services in the performance of medical, dental, or other health care by a health care provider." N.C. Gen.Stat. § 90–21.11. Doctors, nurses, and hospitals all qualify as health care providers. *Id.; Shumaker*, 714 F.Supp. at 158–59 (applying the medical malpractice statute to a physician); *Page v. Wilson Mem'l Hosp.*, 49 N.C.App. 533, 535–36, 272 S.E.2d 8, 10–11 (1980) (nurse); *Moore*, 139 F.Supp.2d at 713 (hospital). To prevail on a medical malpractice claim in North Carolina, a plaintiff must establish: (1) the applicable standard of care; (2) the defendant's breach of that standard; and (3) that the breach caused the plaintiff's injury. *Warden v. United States*, 861 F.Supp. 400, 402–03 (E.D.N.C.1993).

■ The standard of care for claims arising from medical treatment in North Carolina provides:

the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

N.C. Gen.Stat. § 90–21.12. Because this statute does not abrogate common law duties, health care providers must also exercise reasonable care and diligence in providing services and use their best judgment in the treatment and care of patients. *Wall v. Stout*, 310 N.C. 184, 192–93, 311 S.E.2d 571, 576–77 (1984); *Bailey v. Jones*, 112 N.C.App. 380, 385–86, 435 S.E.2d 787, 791 (1993) (citing *Hunt v. Bradshaw*, 242 N.C. 517, 521–22, 88 S.E.2d 762, 765 (1955)).

■ Plaintiffs typically must employ expert testimony to establish the particular standard of care to be applied to their specific facts. *Shumaker*, 714 F.Supp. at 159. Dr. Arthur Kaufman is Plaintiffs' sole expert on the applicable standard of care. Defendant objects that Dr. Kaufman's training and experience do not qualify him to offer expert testimony on the crucial issue in Plaintiffs' medical malpractice claim: whether the standard of care for positioning and padding a patient for radical retropubic prostatectomy was satisfied in this case. Plaintiffs must establish

---

**2.** Plaintiffs' claims arise "out of clinical care provided by the hospital," not "out of policy, management, or administrative decisions." *Iodice v. United States*, 289 F.3d 270, 275 (4th Cir.2002) (citing *Estate of Waters v. Jarman*, 144 N.C.App. 98, 101–02, 547 S.E.2d 142, 144–45 (2001)). Their complaint does not allege ordinary negligence.

the admissibility of Dr. Kaufman's testimony by a preponderance of the evidence, and the court has broad discretion to determine whether expert testimony is admissible. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199–200 (4th Cir.2001).

Dr. Kaufman is the medical director of the External Peer Review Program for the Department of Veterans Affairs, a position he has occupied for 11 years. In this capacity, he conducts monthly meetings of a physician peer review panel to assess the quality of care in 171 Veterans Administration hospitals. This work has given Dr. Kaufman extensive experience with quality assurance and injury prevention in Veterans Administration facilities nationwide. In the 1980's, he served as the medical director of the Department of Defense's Civilian External Peer Review Program, convening panels of doctors to review the quality of care in 167 military health care facilities. Dr. Kaufman testified that he specializes in preventing patient injury. He does not specialize, however, in urology, neurology, or neurosurgery, and he has never received specialized training in those fields. Indeed, Dr. Kaufman has received no surgical training since graduating from medical school in 1963. He did not train as a resident. His last sustained clinical experience involved supervising influenza vaccinations in 1980, and none of the guidelines for patient care that he helped develop during his quality assurance career concerned positioning or padding patients for the type of surgery performed on Mr. Wright.

Dr. Kaufman testified that he "retrospectively" arrived at the standard of care for padding and positioning a patient for a radical retropubic prostatectomy. Because his years of quality assurance training, experience, and analysis have revealed no injuries of the type suffered by Mr.

Wright in the absence of negligence, Dr. Kaufman opined that Mr. Wright's injury could not have occurred in the absence of negligence. Adequate padding of a particular patient depends on that patient's body type, Dr. Kaufman testified, including the patient's weight. The standard of care, then, is to "make an assessment of the individual in terms of the size and configuration of that person and apply sufficient padding to accommodate or over-accommodate" them. (Tr. Apr. 7, 2003 at 25.)[3] When asked what padding guidelines agents of DVAMC must apply to satisfy the standard of care, he answered:

A: ... [M]ake an assessment, and then exceed that estimate. That would be the guideline.

Q: And if [the injury] happens anyway?

A: Then I would say that your estimate or assessment was inadequate.

(Tr. Apr. 7, 2003 at 28–29.) According to Dr. Kaufman, the fact of Mr. Wright's injury demonstrates that he had been inadequately padded on the operating table. Therefore, Dr. Kaufman concluded, Mr. Wright's injury could have been avoided had he been adequately padded.

■ A witness may testify as to his specialized knowledge so long as he is qualified as an expert based on any combination of knowledge, skill, experience, training, or education. Fed.R.Evid. 702; *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir.1993). These qualifications are to be viewed liberally, but the court "must not accept without scrutiny any witness with knowledge of a topic greater than that of the jury's." *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 214 F.Supp.2d 530, 535 (D.Md.2002).

In forming an opinion on the adequacy of the padding provided Mr. Wright during

---

**3.** Transcript citations refer to a certified partial transcript.

the surgery, Dr. Kaufman relied on his experience in quality assurance, his review of medical care provided by the Department of Defense and the Veterans Administration, his education in risk management, and his analysis of Mr. Wright's medical records. He testified that his medical training contributed to his understanding of risk management, because it enabled him to understand operating room procedure. His experience in quality assurance includes performing root-cause analysis of "neurological injuries that have been the result of positioning or padding on operating tables," including injuries to patients who were in the supine position. Dr. Kaufman estimated that he has reviewed medical records describing 20 to 25 such injuries in his career. Based on his training and experience, Dr. Kaufman qualifies as an expert in quality assurance and risk management for hospitals. *See Kopf*, 993 F.2d at 377 (noting that an expert's qualifications are to be liberally construed).

Dr. Kaufman's training and experience have been in the non-clinical speciality of quality assurance, not in an operating room. By his own admission, this fact limits his capacity to testify concerning the proper padding of a patient for prostate surgery. At trial, he conceded that "to the extent clinical judgment is involved" in positioning and padding a patient, those decisions lie beyond his field of expertise. He also acknowledged that for him "to have expertise and give an opinion in this case, one would have to conclude that the issues of positioning and padding are purely procedural issues."

Dr. Kaufman's proffered testimony, however, makes clear that padding a patient goes beyond a mere procedural matter. He explained that the circulating nurse applies the padding to a patient's lower body, while the anesthesiologist pads the upper body. Before operating, the physician checks to make sure that the padding is adequate. Dr. Kaufman acknowledged that health care providers padding a patient for a radical retropubic prostatectomy should rely on their professional experience in determining how much padding would be sufficient. When the court asked Dr. Kaufman how a nurse would evaluate the padding needs of a particular patient, he responded:

A: By overestimating.

Q: Overestimating what?

A: The need for thicker padding.

Q: Well, what's the standard? . . .

A: Im not sure I can answer that question properly, Your Honor.

Q: Well, how can a nurse answer it . . . ?

A: Well, because this is what they do on an ongoing regular basis. This is what they do in terms of preparation of patients for an operative intervention. This is their everyday practice. And they are making that assessment continuously.

(Tr. Apr. 7, 2003 at 24–25.) On cross examination, Dr. Kaufman again acknowledged the necessity of clinical training and experience in determining the standard of care for padding a patient:

Q: Let's assume that you have a circulating nurse with . . . fifteen years of experience. And [further assume] that that nurse has been involved in numerous procedures involving patients . . . in excess of 350 pounds—in radical retropubic prostatectomy procedures, in particular. And let's say that in all of those cases the nurse relied on two inches of padding and none of those patients suffered [an] injury similar to that [injury] that is at issue in this case. Can that nurse rely on that

experience to assume that two inches of padding would be adequate for a person of Mr. Wright's size or of a lesser weight?

A: I would hope so.

(*Id.* at 31–32.)

Dr. Kaufman's admission that he is not competent to testify regarding clinical matters, together with his acknowledgment that the padding of patients demands clinical expertise, makes his testimony on the specific standard of care for padding a patient inadmissible as beyond his field of expertise. *See Thomas J. Kline, Inc. v. Lorillard, Inc.*, 878 F.2d 791, 799 (4th Cir. 1989) (expert testimony is properly excluded if the purported expert lacks "satisfactory knowledge, skill, experience, training [or] education on the issue for which the opinion is proffered"); *Hartke v. McKelway*, 526 F.Supp. 97, 100–101 (D.D.C.1981) (family practitioner unqualified to establish the standard of care for sterilization surgery, where the practitioner had never performed the operation, had no training in the procedure, and the "major reason for her conclusion that there was negligence was that the result was unfavorable").

 Even if Dr. Kaufman qualified as an expert in the clinical aspects of positioning and padding of patients for a prostatectomy, moreover, his proffered testimony on the standard of care does not assist the finder of fact. Expert testimony is admissible under Federal Rule of Evidence 702 if it rests on a reliable foundation and will help the trier of fact understand or resolve a fact at issue. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141–42, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999); *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir.1999). The subject matter of the testimony is proper for expert testimony if it "will recount or employ" specialized knowledge. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir.1993). The facts of each case, however, determine whether expert testimony assists the trier of fact in that case. *Id.* at 379. By Dr. Kaufman's own admission, his clinical limitations render him incapable of explaining how a nurse, anesthesiologist, or anyone else padding a patient could ascertain how much padding would be sufficient for a person of Mr. Wright's body type. Accordingly, his testimony on this subject does not help the trier of fact understand the standard of care or resolve the question of its alleged violation in this case. *See* Fed.R.Evid. 702; *Kline*, 878 F.2d at 799.

Dr. Kaufman's proffered testimony on the standard of care is inadmissible, and Plaintiffs offered no other expert testimony on this point.[4] Thus, the court finds no evidence in the record establishing the applicable standard of care for positioning and padding Mr. Wright. Absent this showing, Plaintiffs cannot prove medical malpractice. *See Makas v. Hillhaven, Inc.*, 589 F.Supp. 736, 743 (M.D.N.C.1984) (granting the defendant's motion for directed verdict in a medical malpractice case because the plaintiff failed to offer expert testimony on the standard of care).

4. Plaintiffs read into the record a brief excerpt from the deposition of Dr. Culley Carson, but that evidence did not address the standard of care. Plaintiffs obviously had an opportunity to present expert testimony from a urologist, neurosurgeon, anesthesiologist, surgical nurse, or other clinical practitioner. Without speculating on their decision not to offer such evidence, "[I]t is implausible to suggest, post *Daubert*, that parties will initially present less than their best expert evidence in the expectation of a second chance should their first try fail." *Weisgram v. Marley Co.*, 528 U.S. 440, 455, 120 S.Ct. 1011, 1021, 145 L.Ed.2d 958 (2000) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

B. *Res Ipsa Loquitur*

 Plaintiffs argue that Defendant is negligent under the doctrine of *res ipsa loquitur,* which permits a fact finder "to infer negligence from the mere occurrence of the accident itself" based on common knowledge or experience. *Diehl v. Koffer,* 140 N.C.App. 375, 378, 536 S.E.2d 359, 362 (2000); *see Grigg v. Lester,* 102 N.C.App. 332, 335, 401 S.E.2d 657, 659 (1991). Because the doctrine depends on common knowledge, a plaintiff can prevail under *res ipsa loquitur* despite offering no expert evidence on the standard of care. *Makas,* 589 F.Supp. at 740–41. When *res ipsa loquitur* applies, it raises an inference of negligence sufficient to submit the issue of negligence to the finder of fact. *Schaffner v. Cumberland County Hosp. Sys., Inc.,* 77 N.C.App. 689, 692, 336 S.E.2d 116, 118 (1985). The burden of proving negligence remains with the plaintiff, however, despite the inference created by the doctrine. *Id.*

 In medical malpractice actions, *res ipsa loquitur* applies if the injurious result rarely occurs standing alone and is not an inherent risk of the operation. *See Parks v. Perry,* 68 N.C.App. 202, 206, 314 S.E.2d 287, 289 (1984). The doctrine is reserved, however, "for those situations in which a physician's conduct is so grossly negligent or treatment is of such nature that the common knowledge of laypersons is sufficient to find [the essential elements]." *Bailey v. Jones,* 112 N.C.App. 380, 387, 435 S.E.2d 787, 792 (1993). North Carolina courts have applied *res ipsa* to injuries involving gross negligence, such as surgical instruments left in the patient's body, *see, e.g., Tice v. Hall,* 310 N.C. 589, 313 S.E.2d 565 (1984) (surgical sponge left in patient's body); *Mitchell v. Saunders,* 219 N.C. 178, 182, 13 S.E.2d 242, 244 (1941) (gauze sponge left in patient); *Pendergraft v. Royster,* 203 N.C.

384, 166 S.E. 285 (1932) (glass tube left in patient); *Hyder v. Weilbaecher,* 54 N.C.App. 287, 283 S.E.2d 426 (1981) (stainless steel wire left in patient), and injuries obviously remote from the site of a surgery, *see, e.g., Jackson v. Mountain Sanitarium,* 234 N.C. 222, 67 S.E.2d 57 (1951) (death of child following tonsillectomy); *Schaffner,* 77 N.C.App. at 692–93, 336 S.E.2d at 118–19 (hand burned during ear surgery); *Parks,* 68 N.C.App. at 207, 314 S.E.2d at 290 (nerve damage in hand following hysterectomy). When treatment results in an injury to an area implicated in the surgical field, however, common knowledge does not support an inference of negligence in North Carolina. *See Diehl v. Koffer,* 140 N.C.App. 375, 380, 536 S.E.2d 359, 363 (2000) ("This Court does not believe that the proper standard of care ... for gallbladder removal nor its attendant risks are within the common knowledge or experience of a jury."); *Grigg v. Lester,* 102 N.C.App. 332, 335, 401 S.E.2d 657, 659 (1991) ("[T]he cause of tears that occur in the uterus during the process of delivering a child by cesarean [*sic*] section is not generally known to laymen.").

 Gross negligence notwithstanding, then, *res ipsa loquitur* rarely is appropriate in medical malpractice actions. Courts have demonstrated an "awareness that the majority of medical treatment involves inherent risks which even adherence to the appropriate standard of care cannot eliminate." *Schaffner,* 77 N.C.App. at 692, 336 S.E.2d at 118; *see also Mitchell,* 219 N.C. at 182, 13 S.E.2d at 245 (observing that a doctor "is not a guarantor of the result of his treatment"). This recognition, "coupled with the scientific and technical nature of medical treatment, renders the average juror unfit to determine whether [a] plaintiff's injury would rarely occur in the absence of negligence." *Schaffner,* 77

N.C.App. at 692, 336 S.E.2d at 118. If a plaintiff's proof can overcome these concerns, however, *res ipsa loquitur* remains available in medical malpractice actions in which the "common knowledge, experience and sense of laymen qualifies them to conclude that some medical injuries are not likely to occur if proper care and skill is used." *Grigg*, 102 N.C.App. at 335, 401 S.E.2d at 659.

▉ Plaintiffs do not argue, however, that common sense equips a layperson to determine whether a lower back injury following a radical retropubic prostatectomy would rarely occur in the absence of negligence. Instead, they attempt to build a foundation for *res ipsa loquitur* on Dr. Kaufman's expert testimony. As explained above, although Dr. Kaufman lacks the expertise to establish the standard of care for padding a patient for a radical retropubic prostatectomy, his quality assurance and risk management experience qualify him to testify on those subjects. Dr. Kaufman testified that injuries such as Mr. Wright's do not occur in the absence of negligence.

To make their argument, Plaintiffs rely exclusively on *Parks*, in which the plaintiff underwent a hysterectomy and emerged from anesthesia with numbness and weakness in her right hand. The plaintiff's expert witness provided all of the evidence suggesting that the plaintiff's injury would not have occurred in the absence of negligence, and the court did not examine the propriety of permitting expert testimony on the issue. *See Parks*, 68 N.C.App. at 209, 314 S.E.2d at 291.

▉ Despite the use of expert testimony in *Parks*, however, recent decisions in North Carolina hold that expert testimony cannot provide the basis for *res ipsa loquitur*.[5] For the doctrine to apply, a plaintiff "must [be] able to show—without the assistance of expert testimony—that the injury was of a type not typically occurring in absence of some negligence by defendant." *Diehl v. Koffer*, 140 N.C.App. at 378–79, 536 S.E.2d at 362; *see also Grigg v. Lester*, 102 N.C.App. at 335, 401 S.E.2d at 659. The recent case of *Anderson v. Assimos*, 146 N.C.App. 339, 553 S.E.2d 63 (2001), *vacated on other grounds*, 356 N.C. 415, 417, 572 S.E.2d 101, 103 (2002), confirms this rule. In *Anderson*, the court found that the side effects of gentamicin, a drug given to the plaintiff, and possible negligence in the defendants' failure to monitor those side effects, were beyond the scope of common knowledge and experience. The court concluded: "Plaintiff needs the benefit of expert testimony to establish the standard of care to be used in the administration of gentamicin and Defendants' possible breach of this standard of care. Accordingly, the doctrine of *res ipsa loquitur* did not apply to Plaintiff's medical malpractice action." *Id.* at 343, 553 S.E.2d at 67 (citation omitted). The decision later was vacated on other grounds, leaving this portion of the holding as the sole foundation for the appeal's final disposition. *See Anderson v. Assimos*, 356 N.C. 415, 417, 572 S.E.2d 101, 103 (2002).

On state law matters, the court must treat decisions of the state supreme court as binding and depart from an intermediate court's holding only if it would not

---

5. In other jurisdictions, by contrast, an expert may provide a foundation for *res ipsa loquitur* by testifying that the plaintiff's injury does not ordinarily occur in the absence of negligence. *See, e.g., Mireles v. Broderick*, 117 N.M. 445, 872 P.2d 863, 866 (1994) (citing multiple authorities and joining the "growing consensus of courts" allowing expert testimony to form a foundation for *res ipsa loquitur*); Restatement (Second) Torts § 328D cmt. d (1965) ("[E]xpert testimony that such an event usually does not occur without negligence may afford a sufficient basis for the inference [of negligence].").

withstand appellate scrutiny. *Iodice v. United States,* 289 F.3d 270, 275 (4th Cir. 2002). The court concludes that in light of the common knowledge requirement and the clear language of *Diehl* and *Anderson,* Plaintiffs may not invoke Dr. Kaufman's testimony to establish an inference of negligence under *res ipsa loquitur.*

 Even if Plaintiffs could rely on Dr. Kaufman's testimony, however, the court notes that their evidence does not support an inference of negligence considering the "somewhat restrictive" manner in which *res ipsa* has been applied to negligence cases in North Carolina. *Mitchell v. Saunders,* 219 N.C. 178, 182, 13 S.E.2d 242, 244 (1941). Despite the use of expert testimony in *Parks,* its holding, like other *res ipsa* cases, must rest on "the superior logic of ordinary human experience." *Diehl,* 140 N.C.App. at 378, 536 S.E.2d at 362; *see also Schaffner v. Cumberland County Hosp. Sys., Inc.,* 77 N.C.App. 689, 692, 336 S.E.2d 116, 118 (1985) (noting that *res ipsa* is inappropriate unless the plaintiff overcomes the concern that the "nature of medical treatment[ ] renders the average juror unfit to determine" whether an injury would occur in the absence of negligence). Common knowledge supported an inference of negligence in *Parks,* in which the plaintiff underwent a hysterectomy and awoke with numbness in her hand. In this case, by contrast, Mr. Wright underwent prostate surgery and awoke with pain in his lower back and leg, areas relatively close to the surgical site and distinct from the sort of post-operative injuries that North Carolina courts have seen as eligible for *res ipsa loquitur. See, e.g., Tice v. Hall,* 310 N.C. 589, 313 S.E.2d 565

(1984); *Jackson v. Mountain Sanitarium,* 234 N.C. 222, 67 S.E.2d 57 (1951); *Mitchell,* 219 N.C. at 182, 13 S.E.2d at 245; *Pendergraft v. Royster,* 203 N.C. 384, 166 S.E. 285 (1932); *Schaffner,* 77 N.C.App. at 692–93, 336 S.E.2d at 118–19; *Hyder v. Weilbaecher,* 54 N.C.App. 287, 283 S.E.2d 426 (1981). Confirming this distinction, the North Carolina Court of Appeals has previously distinguished *Parks* as involving an injury "to a part of the patient's anatomy outside of the surgical field." *Grigg v. Lester,* 102 N.C.App. 332, 335, 401 S.E.2d 657, 659 (1991).

In *Parks,* moreover, no evidence suggested that a hand injury was an inherent risk of a hysterectomy. Here, Dr. Robertson, Defendant's expert, testified that low back pain was not uncommon following a radical retropubic prostatectomy, and that he was aware of instances involving permanent, post-operative back injury. In a case such as Mrs. Parks's, "a jury, based on common knowledge and experience, could reasonably conclude that [an injury] on a portion of her body not involved in the surgery was not among those risks." *Schaffner,* 77 N.C.App. at 693, 336 S.E.2d at 118–19. An injury to the lower back, an area close to the surgical site which sometimes sustains an injury following the procedure, does not permit a common sense inference that such an injury was caused by negligence.[6] That sort of determination requires an understanding of the relationship between a patient's musculature and the complex nervous system that is beyond the reach of laymen. Such an inference simply is not permissible in this case.

---

**6.** By way of comparison, the plaintiff in *Grigg v. Lester,* 102 N.C.App. 332, 335, 401 S.E.2d 657, 659 (1991), experienced a tear in the rear wall of her uterus during a Caesarean section. While recognizing that common sense would suggest such an injury resulted from force applied by the physician, the court held that a layperson "would have no basis for concluding that the force exerted by the physician was either improper or excessive." *Id.*

■ Finally, the court observes that even if Plaintiffs could survive their impermissible reliance on expert testimony, then manage to establish an inference of negligence based on *res ipsa loquitur,* they nevertheless would fail to carry their ultimate burden of proof. *See Schaffner v. Cumberland County Hosp. Sys., Inc.,* 77 N.C.App. 689, 692, 336 S.E.2d 116, 118 (1985). According to the *Parks* standard, Plaintiffs must show by a preponderance of the evidence that Mr. Wright's back injury would rarely occur in the absence of negligence and was not an inherent risk of the operation. *Id.,* 68 N.C.App. at 206, 314 S.E.2d at 289. Plaintiffs' evidence consisted principally of testimony from Dr. Kaufman and Mr. Wright. As explained above, Dr. Kaufman's testimony is limited by his lack of clinical experience. By contrast, Defendant's expert, Dr. Robertson, is a urologic oncologist on the faculty of Duke University who has published extensively in his field and performed over 1000 prostatectomies. He testified that low back pain and numbness were common short-term side effects of radical retropubic prostatectomy. Dr. Robertson also stated that the procedure involves a small risk of permanent nerve damage such as that sustained by Mr. Wright, and that the standard of care did not mandate additional padding for Mr. Wright. Dr. Robertson and Dr. Hall, who performed the surgery, both testified that the preparation, positioning, and padding of Mr. Wright and the performance of the prostatectomy complied with the standard of care.

The court found it very significant that Mr. Wright made inconsistent statements about the condition of his back and legs before surgery. At trial, he testified that before the surgery he had never experienced back pain or numbness. His medical records, however, indicate that he had previously complained about back trauma in 1970 and "recurrent back pain" and leg pain and numbness in 1993. Mr. Wright struggled to reconcile these statements with his trial testimony, a problem compounded by the memory lapses he admittedly experiences as a result of his stress disorder. Regardless of whether he experienced back pain and numbness before the surgery, the apparent contradiction between Mr. Wright's trial testimony and his medical records casts a shadow on his credibility. The veracity of his past and present statements, in turn, affects the testimony of Dr. Kaufman, whose lack of clinical expertise rendered him highly dependent on Mr. Wright's medical records to reach a "retrospective" conclusion about negligence. When measured against Defendant's evidence, these shortcomings prevent Plaintiffs from carrying their burden of proof.

Assuming for the sake of argument that *res ipsa loquitur* applied in this case, the court as trier of fact nevertheless may reject the inference of negligence, even if Defendant had presented no evidence. *Schaffner,* 77 N.C.App. at 692, 336 S.E.2d at 118. Defendant, however, presented significant evidence tending to show that its treatment of Mr. Wright was not negligent. Weighing the evidence, the court concludes that Plaintiffs failed to prove negligence by a preponderance of the evidence.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* Venue is proper in this district. 28 U.S.C. § 1402(b).

2. Dr. Robertson and Dr. Hall, who performed the surgery, and the operating team who positioned and padded Mr. Wright were employees or agents of

the United States acting within the scope of their employment.

3. Dr. Robertson, a urologic oncologist serving as Defendant's expert on the standard of care, was qualified to offer opinion testimony on the applicable standard of care.

4. Dr. Kaufman, a quality assurance specialist serving as Plaintiffs' expert on the standard of care, was not qualified to offer opinion testimony on the applicable standard of care.

5. Even if Dr. Kaufman had qualified to testify on the applicable standard of care, his testimony regarding the standard for positioning and padding a patient of Mr. Wright's body type for a radical retropubic prostatectomy did not assist the trier of fact.

6. Because Plaintiffs must rely on Dr. Kaufman's inadmissible expert testimony to show that an injury such as Mr. Wright's does not occur in the absence of negligence, *res ipsa loquitur* does not apply under North Carolina law.

7. Even if Plaintiffs could rely on Dr. Kaufman's testimony, Mr. Wright's back pain is distinct from the type of injuries recognized in North Carolina as appropriate for *res ipsa loquitur*.

8. Even if *res ipsa loquitur* applied in this case, Plaintiffs failed to show by a preponderance of the evidence that Defendant was negligent. They further failed to show by a preponderance of the evidence that Defendant's negligence caused their injuries.

A judgment for Defendant in accordance with these findings of fact and conclusions of law shall be filed contemporaneously herewith.

## *JUDGMENT*

For the reasons stated in open court during trial and for the reasons stated in the Findings of Fact and Conclusions of Law filed contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant United States is not liable.